UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

BLACK DIAMOND SPORTSWEAR, INC., :
      Plaintiff,        :
                       :
      v.               :   Docket No. 1:03-cv-278
                       :
BLACK DIAMOND EQUIPMENT, LTD.,  :
      Defendant.      :
_____:

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Paper 74)

    Defendant Black Diamond Equipment ("BDE") moves for summary judgment under Fed. R. Civ. P. 56 on all claims asserted by plaintiff Black Diamond Sportswear, Inc. ("BDS"). For the reasons set forth below, defendant's motion for summary judgment is GRANTED.

BACKGROUND

    Green Mountain Woolens ("GMW") was started by Gary Guggemos in Waitsfield, VT, almost 30 years ago. Commencing in 1986, the first product was branded with the Black Diamond name, and that brand name was registered in 1989 in Vermont, and in January 1990 with the United States Patent and Trademark Office ("USPTO"). GMW later changed its name to "Black Diamond Sportswear" to be more consistent with its branding. BDS continued concentrating on high-performance skiwear, with most products consisting of synthetic fleece and insulated and shell outer garments. In the early 1990s,

1

BDS developed "wind bloc" fleece; a combination of Polarfleece®, a laminated layer of polymer, which creates a breathable barrier, and a layer of tricot or mesh on the back.  BDS has maintained its own retail outlets, all located in Vermont.  The South Burlington store is the sole remaining store.  In addition, BDS products are carried in over 400 retail outlets in the United States.

BDE was formed in the fall of 1989 when a group of employees of Chouinard Equipment, Ltd., purchased Chouinard's assets out of Chapter 11 bankruptcy, including Chouinard's entire line of technical gaiters, gloves, mittens and climbing pants.  The acquired assets included Chouinard's "Diamond C" logo, a black diamond shape with a "C" embedded in it.  Chouinard's creditors demanded that the purchase of the assets close by mid-November 1989 and December 1, 1989 became the "drop dead date" for the commencement of business of the new company.

In September 1989, the employee purchasers were in "scramble mode" to select a name for the new company since Chouinard's founder and owner would not permit them to adopt the former business's name.  Building upon Chouinard's goodwill – a "Diamond C" logo – the purchasers chose the name "Black Diamond Equipment" and included the "Diamond C" logo as the "c" in Black.

2

After informal research, none of the Chouinard employees was aware of the use of the Black Diamond name in businesses selling similar products, so BDE began to retool the manufacturing process using the Black Diamond name.  In October 1989, BDE commissioned a trademark search and found BDS's application to register the Black Diamond mark in International Class 25 for skiwear, and a Vermont registration for "Black Diamond Skiwear."  The USPTO refused BDE's International Class 28 application for clothing and ski equipment, on the basis that "[a] liklihood of confusion exists between [BDE's mark] and [BDS's mark] because the marks are identical . . . [and] [t]he goods are related as well."  After removing references to clothing from its application, BDE successfully registered the mark in International Class 28.

BDE's CEO, Peter Metcalf, saw little risk of confusion since BDS had only recently applied for the mark and none of the employees had heard of BDS.  Moreover, his company specialized in high-end technical products for hardcore backcountry pursuits and climbing; Metcalf and his team believed "skiwear" was not part of their market.  BDE has grown into a company with a nationwide catalog distribution of 150,000, and all of its products have been displayed and available for purchase on its website since 1999.  BDE owns

3

the U.S. registration of the Black Diamond mark in International Classes 9, 28, 8, and 22, for various climbing and mountaineering devices and related products.

Mr. Guggemos, the CEO of BDS, learned of BDE's existence in 1990.  At that time, he sent a trade journal article to his trademark attorney.  Neither Guggemos nor that attorney have a detailed recollection of their communication.  The sole written record of any advice by the attorney is a note to his file describing a January 24, 1990 telephone conference with Guggemos which states: "advised, wait until [registration] in hand & then review problem."  Guggemos did not proceed to notify BDE of a potential problem because he believed BDE was a mountain climbing equipment company, and therefore, not in direct competition with BDS.

Since at least 1990, BDS and BDE have attended the same Outdoor Retailer ("OR") trade shows and were listed side by side in exhibitor handbooks.  For instance, in 1997 they were listed together in the "Gloves and Mittens" category.  BDE's catalogs were available to anyone who passed by its booth at the OR shows.

Since 1989, BDE's product line has included technical softgoods products – gaiters, gloves, mittens, climbing pants, and promotional items such as hats and t-shirts – all pictured in its catalogs circulated to the general public.

4

In 1998, BDE commenced distributing its first items of fleece skiwear, including a vest and an "Alpine Pant" for "skiing, ice climbing and mountaineering."  In 1999, it added another ski pant to its product line; in 2001, a fleece shirt; and in 2002, a "PowerDry Pullover" and "Hi-Tech Long Sleeve" shirt. Additionally, its glove offerings are now expanded to 11 models, including a fleece "Windstopper" glove.

In 2002, BDE attempted to purchase the Black Diamond mark from BDS, but the negotiations were unsuccessful.  In August 2003, BDE brought suit in Utah for declaratory relief, claiming BDS has acquiesced to BDE's use of the mark and that BDS's mark had been diluted and was unenforceable.  BDS subsequently filed suit in Vermont alleging trademark infringement, false designation of origin, and dilution under federal common law and the Lanham Act.  BDS voluntarily withdrew an additional claim of tortious interference.

## DISCUSSION

A motion for summary judgment is properly granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995).  The burden is on the moving party to demonstrate there are no material facts genuinely in dispute. See Weinstock v. Columbia Univ., 224 F.3d 41 (2d Cir. 2000).

In deciding a motion for summary judgment, the court must view the facts and all the inferences to be drawn therefrom in the light most favorable to the party opposing the motion.  Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

I.   LACHES

In its summary judgment motion, BDE argues it is entitled to summary judgment because all BDS's claims are barred by the doctrine of laches.  The Second Circuit has long recognized the defense of laches when a party alleges violations of the Lanham Act.  Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 193 (2d Cir. 1996) (affirming dismissal of trademark infringement on laches grounds).  Laches is a "fundamental threshold matter" that must be resolved before reaching the merits of the plaintiff's trademark claims.  See Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 216 (2d Cir. 2003).  The three elements of the defense of laches are:  "[1] the plaintiff had knowledge of defendant's use of its marks, [2] that plaintiff inexcusably delayed in taking action with respect thereto, and [3] that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."  Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1040 (2d Cir. 1980).

As to the first element, BDS had knowledge of BDE's use of the Black Diamond mark.  Mr. Guggemos, the CEO of BDS, learned of BDE's existence in 1990 after reading a trade journal article about the formation of BDE.  After sending the article to his attorney, he was advised to wait until BDS's registration was approved before addressing any potential problems.  Futhermore, BDS and BDE attended the same Outdoor Retailer trade shows since at least 1990 and were listed side by side in exhibitor handbooks.

The second prong of a laches defense is whether plaintiff inexcusably delayed in taking action with respect to its trademark rights.  BDE claims BDS has no justifiable excuse for the delay because BDS is presumed to know that for 14 years, BDE sold essentially the same product line.  In response, BDS claims its delay is excused because there were dramatic and material expansions of BDE's infringement occurring after 1997, and therefore, BDE progressively encroached upon BDS's mark.

A plaintiff's delay in bringing suit will not be excused absent a showing that the plaintiff was somehow prevented from timely asserting its rights.  See Eppendorf-Netheler-Hinz v. Enterton Co., 89 F. Supp. 2d 483, 487 (S.D.N.Y. 2000) (no excuse for eight-year delay where plaintiff failed to show it was prevented from filing suit).  BDE must prove BDS

waited an unreasonable time after BDE began infringing the mark, which does not necessarily have to be the first date BDE used the mark on clothing.  <u>Schieffelin & Co. v. The Jack Co. of Boca, Inc.</u>, 850 F. Supp. 232, 253 (S.D.N.Y. 1994) ("the mere fact of a delay does not translate into estoppel. As the court explained in <u>Johanna Farms, Inc. v. Citrus Bowl, Inc.</u>, 486 F. Supp. 866, 881 (E.D.N.Y. 1978), the trademark owner is not obliged to sue at the first sign of a *de minimis* infringing use; rather, the time from which estoppel or laches should be measured is the day when the likelihood of confusion looms large").  As the Second Circuit explained:

> The doctrine of progressive encroachment, therefore, focuses on the question of whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and increased the likelihood of confusion of the marks. . . .  Thus, in order to evaluate whether the doctrine of progressive encroachment excuses plaintiff's delay in bringing suit, the court must compare the likelihood of confusion from [first use of the mark] and from its [most recent use of the mark].

<u>Profitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy, P.C.</u>, 314 F.3d 62, 70 (2d Cir. 2002); <u>see</u> <u>also</u> <u>Kason Indus., Inc. v. Component Hardware Group, Inc.</u>, 120 F.3d 1199 (11th Cir. 1997) ("delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement").

8

The rationale behind the progressive encroachment doctrine "is that a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known . . . that plaintiff had a provable infringement claim against the defendant." Profitness, 314 F.3d at 70.  But where the parties are alleged to directly compete, mere growth in the scope of the defendant's business does not constitute progressive encroachment.  Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 311 F. Supp. 2d 1023, 1034-35 (D. Or. 2004).  Requiring a significant change, rather than mere business growth, "reduces the risk of encroachment arguments based on 'nothing more than a post hoc rationalization for unreasonable delay.'"  Id. (quoting Chattanooga Mfg., Inc. v. Nike, Inc., 301 F.3d 789, 794 (7th Cir. 2002).  "It cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished."  Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 498 (2d Cir. 1961).

In 1989, the first year of BDE's existence, its catalog consisted of five clothing items – sometimes referred to as technical softgoods – which all bore the previous company's

logo, Chouinard.  The clothing line depicted in BDE's 2003 catalog contains nine additional clothing products, some of which are made of fleece comparable to those sold by BDS. Since 1989, BDE has sold its technical softgoods through independent retailers nationwide, including Vermont, and through REI since 1995.  BDS had to be aware by the mid-1990s that a company using a similar mark was selling goods in direct competition with it.  Therefore, BDS cannot be excused for the delay in asserting its trademark rights.

As to the third element of a laches defense, it is clear the defendant will be prejudiced by BDS's assertion of its trademark rights.  Two types of prejudice may be implicated in a laches analysis: "the decreased ability of the defendants to vindicate themselves . . . on account of fading memories or stale evidence," Eppendorf-Netheler-Hinz, 89 F. Supp. 2d at 487, and when "a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." Conopco, 95 F.3d at 192 (defendant prejudiced by five-year delay where it "committed massive resources to best exploit a marketing strategy" and delay precluded possibility the defendant could have adopted an alternative strategy).

Both forms of prejudice are present here.  The relevant documents and the memories of the witnesses now date back

more than 15 years, and most witnesses, including each
party's principal, do not remember key events.  The passage
of time has adversely affected BDE's ability to defend
itself.

Furthermore, BDE has concentrated its marketing efforts
– using the Black Diamond logo – on the ability to offer an
integrated product mix that includes its technical softgoods
products.  BDE has changed its position by marketing branded
softgoods in reliance of BDS's failure to assert its
trademark rights sooner, and therefore, BDE is prejudiced by
the delay in BDS's assertion of its rights.

II.  UNCLEAN HANDS

BDS argues estoppel by laches is not an available
equitable defense because BDE does not have clean hands.
Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 104 F.3d
104, 107 (2d Cir. 2000).  BDS asserts BDE intentionally
infringed in bad faith by using the Black Diamond mark after
it learned of Green Mountain Woolen's Black Diamond mark for
ski wear in Class 25 and after the USPTO refused its
application for clothing and ski equipment, stating that "[a]
likelihood of confusion exists between [BDE's mark] and
[BDS's mark] because the marks are identical . . . [and]
[t]he goods are related as well."

11

Neither knowledge of a prior registration nor rejection of an application to register a mark alters the rule that unclean hands requires a showing of fraudulent intent to capitalize on a competitor's reputation or good will.  Land v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991) (no bad faith despite knowledge of registration; defendant's explanation for choice of mark negated inference of intent to capitalize on plaintiff's goodwill); Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 46-48 (2d Cir. 1978) (no bad faith despite knowledge of registration; defendant had innocent explanation for selection of name); M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d 91 (E.D.N.Y. 2003) (no bad faith despite use of mark after rejection by USPTO because defendant's choice of mark was unrelated to plaintiff).

In this case, it is undisputed BDE chose the mark to take advantage of the good will in Chouinard's "Diamond C" logo before it learned of Green Mountain Woolens' application to register its Black Diamond mark.  BDE never sought to pass off its products as those of BDS.  Furthermore, because the names BDE and BDS came into existence at about the same time, it is difficult to understand how BDE could have fraudulently capitalized on BDS's good will and reputation.

BDS additionally claims BDE concealed the use of the Black Diamond mark by informing BDS on numerous occasions that it was not selling clothing.  BDE disputes this assertion.  Although a factual dispute may exist, it is immaterial.  "[A] plaintiff may be barred when defendant's conduct has been open and no adequate justification for ignorance is offered."  Chandon Champagne Corp. v. San Marino, 335 F.2d 531, 535 (2d Cir. 1964).  Even if Metcalf told Guggemos that BDE was not in the clothing business, Guggemos need only have reviewed a catalog to determine the products BDE was promoting.  BDE's technical softgoods were widely available at OR trade shows, in its catalogs, at retail stores (specialty and chain), and on the internet.

Because BDE did not fraudulently infringe upon the Black Diamond mark to capitalize on BDS's reputation or good will, there is no bad faith on the part of BDE and its laches defense is available and bars BDS from asserting its trademark rights.

III. INJUNCTIVE RELIEF

BDS argues that even if BDE successfully asserts a defense of laches, BDS is not barred from seeking injunctive relief.  In the Second Circuit, "even where laches and acquiescence would bar damages, moreover, a court may nonetheless grant injunctive relief if it determines that the

13

likelihood of confusion is so great that it outweighs the effect of plaintiff's delay in bringing suit." Profitness, 314 F.3d at 68.  "In such cases, revival allows plaintiff to obtain injunctive relief only, not damages." Harley-Davidson, Inc. v. Estate of O'Connell, 13 F. Supp. 2d 271, 285 (N.D.N.Y. 1998)

To seek an injunction despite laches, the "plaintiff's burden is a heavy one, since the 'inevitable confusion' must be established by 'clear and convincing evidence.'" Id. While this Circuit has recognized "it is difficult to establish actual confusion on the part of retail customers, no evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal." Plus Products v. Plus Disc. Foods, Inc., 722 F.2d 999, 1006 (2d Cir. 1983) (internal citations omitted).

BDE and BDS have been selling gloves and mittens, gaiters, t-shirts, and other outdoor equipment and clothing for 16 years and there is a significant lack of evidence of confusion.  BDS presents no affidavit or deposition testimony from consumers alleging confusion, and no expert has been commissioned to determine a likelihood of confusion.  Without evidence to support its claim of actual or potential confusion, BDS's request for injunctive relief must fail.

14

<u>CONCLUSION</u>

For the reasons stated herein, defendant's motion for summary judgment is GRANTED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 25th day of August, 2005.

<u>/s/ J. Garvan Murtha</u>
J. Garvan Murtha
United States District Judge